IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DAWN RUSTAD-LINK,<br><br>               Plaintiff,<br><br>    vs.<br><br>METROPOLITAN LIFE INSURANCE<br>COMPANY ("METLIFE"),<br><br>          Defendant. | CV 13-111-M-DLC-JCL<br><br>FINDINGS &<br>RECOMMENDATION |

Plaintiff Dawn Rustad-Link brings this action against Defendant

Metropolitan Life Insurance Company ("Metlife") under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., seeking to

recover accidental dismemberment insurance benefits she claims are due her under

-1-

an employee health care plan.   The parties have filed cross-motions for summary

judgment on the question of whether Rustad-Link is entitled to benefits under the

terms of the plan.   Because Metlife did not abuse its discretion in finding that

Rustad-Link's claim was excluded from coverage, Metlife's motion for summary

judgment should be granted and Rustad-Link's cross-motion should be denied.

## I.     Background

In late May 2010, Rustad-Link developed a bowel obstruction and made

two trips to the emergency room at St. Joseph Hospital in Ronan, Montana, with

complaints of severe abdominal pain, nausea, and vomiting.  (Doc. 26-6, at 1; 31-

7, at 2-20).  Rustad-Link made a third trip to the emergency room on May 28,

2010, at which time she was admitted to the hospital under the care of Dr.

Nathaniel Buffington.  (Doc. 26-6, at 1; 31-7, at 2-20).  Late that night,  Dr.

Buffington ordered the insertion of a central femoral venous line for the purpose

of administering pressor medications to support Rustad-Link's blood pressure.

(Doc. 31-7, at 13; 18-19).  During the procedure, Dr. Buffington mistakenly placed

an intravenous line in Rustad-Link's right femoral artery instead of her right

femoral vein, resulting in injury to the right femoral artery.  (Doc. 26-6, at 1; 26-5,

at 4).  Dopamine, which is a pressor medication, was then infused through the line

instead of intraveneously, and Rustad-Link suffered ischemia to her right lower

leg.  (Doc. 26-6, at 1).

Rustad-Link developed sepsis and her condition continued to deteriorate. On May 29, 2010, she was transferred to St. Patrick Hospital in Missoula, Montana, in critical condition. (Doc. 31-7, at 21; 31-8, at 3).  She presented with abdominal pain and worsening sepsis.  (Doc. 31-7, at 27).  Rustad-Link's doctors believed her sepsis likely had a gastrointestinal source, and performed an exploratory laparotomy to treat her small bowel obstruction.  (Doc. 31-7, at 27 & 30).

On May 30, 2010, Rustad-Link's lower right leg was noted to be extremely cool and white.  An angiogram revealed a dissection flap involving the right common iliac artery with occlusion of the external iliac artery.  (Doc. 31-7, at 27). Doctors placed a stent in the right external iliac artery to treat the right external iliac dissection, but it became clear over the next few days that the right lower leg was not salvageable.  (Doc. 31-7, at 27).  Rustad-Link developed gangrene, and on June 2, 2010, her right leg was amputated below the knee.  (Doc. 31-7 at 27-28; 31-8, at 1).

At the time these events transpired, Rustad-Link was a participant in an accidental death and dismemberment plan ("the Plan") maintained by her employer, Providence Health and Services.  The Plan is an employee welfare

benefit plan governed by ERISA. Providence Health and Services is the Plan Administrator. (Doc. 31-1, at 91). Metlife is the accidental death and dismemberment insurance underwriting company for the Plan, and also serves as the claims administrator. (Doc. 31-1, at 91-94). The Plan gives Metlife, as a Plan fiduciary, the "discretionary authority to interpret the terms of the Plan and to determine eligibility for an entitlement to Plan benefits in accordance with the terms of the Plan." (Doc. 31-1, at 94).

On or about February 7, 2012, Rustad-Link submitted a claim for accidental dismemberment benefits under the Plan. (Doc. 31-6, at 1-10). Rustad-Link answered a question on the claim form asking for "a brief description of the accident" as follows: "physician inserted right femoral line. He then injected dopamine/vasoconstrictor through this line causing vascular ischemia thus resulting in gangrene and subsequent need for amputation of right lower extremity." (Doc. 31-6, at 2).

Rustad-Link's attending physician, Dr. Louis Kattine, also completed a written statement. (Doc. 31-6, at 4). In answer to a question asking for a description of Rustad-Link's injuries, Dr. Kattine wrote: "Sepsis, small bowel obstruction, injury right femoral/iliac artery." He identified "[p]erfusion of right lower extremity with pressor medication via femoral arteria line placed at St.

Joseph Hospital" as a contributing cause of Rustad-Link's loss, and stated that the cause of the amputation was "gangrene secondary to vascular occlusion." (Doc. 31-6, at 4).

The Plan defines an accident as "[a]n unforeseen and unavoidable event resulting in an injury which is not due to any fault of the covered person." (Doc. 31-3, at 42). Metlife denied Rustad-Link's claim based on an exclusion for loss caused or contributed to by "physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity." (Doc. 31-1, at 77; 31-6, at 13-15).

On March 29, 2012, Rustad-Link, through counsel, appealed MetLife's decision and sought clarification of the denial letter. (Doc. 31-6, at 16). In response, MetLife reiterated the basis for its denial. (Doc. 31-6, at 17-18). Rustad-Link then asked that MetLife reverse it decision on the ground that her alleged loss fell within an exception to a different exclusion from coverage under the Plan. (Doc. 31-6, at 17-20).

As part of its appeal review process, MetLife obtained Rustad-Link's complete medical records and arranged to have Dr. Elyssa Del Valle review Rustad-Link's file. (Doc. 31-6, at 24-25; 50-51). Dr. Del Valle completed her peer review report on July 25, 2012. (Doc. 31-8, at 27-30). She concluded that the

amputation of Rustad-Link's leg "was caused by a physical illness or dissection of right common iliac artery with resultant occlusion with resultant loss of perfusion through the vessel to tissue below the occlusive site."  (Doc. 31-8, at 30).

On August 2, 2012, following its review of Dr. Del Valle's opinion, MetLife denied Rustad-Link's appeal and upheld its original decision denying her claim for accidental dismemberment benefits based on the exclusion for loss caused or contributed to by "physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity."  (Doc. 31-8, at 34-36). Rustad-Link requested further review, but MetLife advised her on August 25, 2012,  that she had exhausted all of her appeal right under ERISA and her claim was closed.  (Doc. 31-8, at 38).

In June 2013, Rustad-Link commenced this action seeking judicial review of MetLife's decision.  (Doc. 1).   She alleges that MetLife breached the terms of the Plan by denying her claim for accidental dismemberment benefits, and seeks damages in the amount of unpaid benefits, prejudgment interest, and attorney fees and costs.  (Doc. 1, at 13-14).  The parties agree that this matter is properly resolved by the Court on cross-motions for summary judgment based on the administrative record.  (Doc. 12, at 2).

## II.    Legal Standards

A.     ERISA Standard

An ERISA plan administrator's or fiduciary's decision to deny or terminate benefits is reviewed "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits, that determination is reviewed for abuse of discretion." *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 981 (9th Cir. 2005) (citing *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1471 (9th Cir. 1992)).

Here, it is undisputed that the Plan gives MetLife the "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." (Doc. 31-1, at 94). The Plan specifically provides that "[a]ny interpretation of determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation and determination was arbitrary and capricious." (Doc. 31-1, at 94). Such a clear and unequivocal grant of discretion to the administrator or fiduciary is typically adequate to warrant application of the

deferential abuse of discretion standard of review. *See Abatie v. Alta Health & Life Ins.*, 458 F.3d 955, 963-64 (9th Cir. 2006).

Rustad-Link nonetheless argues she is entitled to de novo review because the Plan's discretionary clause is void under Montana law. For support, she relies on United States District Judge Donald W. Molloy's decision in *Standard Insurance Company v. Morrison*, 537 F.Supp.2d 1142, 1144 (D. Mont. 2008). The plaintiff insurance company in that case challenged the Montana Insurance Commissioner's authority under Mont. Code Ann. § 33-1-502 to disapprove insurance policies with discretionary clauses. *Standard Insurance*, 537 F.Supp.2d at 1144. Judge Molloy sided with the Commissioner, concluding that the Commissioner's authority to disapprove of insurance policies containing discretionary clauses was a regulation of insurance not preempted by ERISA. *Standard Insurance*, 537 F.Supp. 2d at 1153. The Ninth Circuit affirmed, holding that the Commissioner's practice of disapproving insurance policies with discretionary clauses did not run afoul of ERISA. *Standard Insurance Co. v. Morrison*, 584 F.3d 837, 849 (9th Cir. 2009).

*Standard Insurance* does not, however, stand for the broad proposition that discretionary clauses are void under Montana law, thereby requiring de novo review. *Standard Insurance* simply "dealt with the Commissioner's authority

under [Mont. Code Ann.] § 33-1-501 to disapprove insurance policies delivered or issued to be delivered in Montana; it did not address any alleged blanket prohibition on applying discretionary clauses in Montana courts." *L'Heureux v. Hartford Life and Accid. Ins. Co.*, 9:07-cv-00036-DWM, doc. 26 (Order of April 15, 2008). Unlike *Standard Insurance*, the Commissioner has not disapproved the Plan at issue here, which means that *Standard Insurance* is simply inapposite. Because the Plan clearly and unequivocally gives MetLife the discretionary authority to determine eligibility for benefits, its decision denying Rustad-Link's claim for accidental dismemberment benefits is properly reviewed for an abuse of discretion.

"ERISA plan administrators abuse their discretion if they render decisions without any explanation, ...construe provisions of the plan in a way that conflicts with the plain language of the plan, or rely on clearly erroneous findings of fact." *Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1096 (9th Cir. 2012) (internal quotations and citations omitted). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [court] is left with the definite and firm conviction that a mistake has been committed." *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005).

Even under lenient abuse of discretion review, "ERISA places the burden of

proving an exclusion from coverage in an ERISA-regulated welfare plan on the plan administrator." *Boldon v. Humana Ins. Co.*, 466 F.Supp.2d 1199 (D. Ariz. 2006) (*quoting Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 580 (6th Cir. 2002)). "The administrator will have failed to satisfy this burden and accordingly abused its discretion if it construed a coverage exclusion in a fashion that 'conflicts with the plain language of the plan.'" *Boldon*, 466 F.Supp. at 1210 (*quoting Wallace v. Intel Corp.*, 2006 WL 2709839, at *9 (D. Ariz. Sept. 20, 2006).

B.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).   The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).  When presented with cross-motions for summary judgment, the Court must "evaluate each motion separately, giving the non-moving party in each instance

the benefit of all reasonable inferences." *ACLU v. City of Law Vegas*, 333 F.3d

1092, 1097 (9th Cir. 2003), *cert. denied* 540 U.S. 1110 (2004).

## III.    Discussion

Where, as here, the plaintiff challenges a denial of benefits under an ERISA

plan conferring discretionary authority on the plan administrator, the question

presented on cross-motions for summary judgment is whether, based on the

undisputed administrative record, the plan administrator's decision denying

benefits was an abuse of discretion.

As noted above, MetLife denied Rustad-Link's claim based on Plan's

exclusion "for any loss caused to contributed to" by "physical or mental illness or

infirmity, or the diagnosis or treatment of such illness or infirmity." (Doc. 31-1, at

77). The undisputed evidence of record amply supports MetLife's determination

that Rustad-Link was not entitled to accidental dismemberment benefits because

medical treatment of an illness or infirmity caused or contributed to the eventual

amputation of her lower right leg.

Rustad-Link was under Dr. Buffington's care for treatment of a bowel

obstruction when he mistakenly placed an intravenous line in her right femoral

artery instead of her right femoral vein, resulting in injury to the right femoral

artery. (Doc. 26-6, at 1; 26-5, at 4). As Rustad-Link herself alleges, the injury to

her right femoral artery, combined with the pressor medication infused through the misplaced intravenous line, "resulted in loss of circulation, gangrene, and a necessary amputation of her lower leg." (Doc. 26, ¶¶ 9-10). The medical records indeed reflect that the pressor medication Dr. Buffington infused through the misplaced intravenous line caused ischemia, or loss of circulation, in Rustad-Link's lower right leg. (Doc. 26-6, at 1). When subsequent efforts to repair the damaged artery were unsuccessful, Rustad-Link developed gangrene and her right leg was amputated below the knee. (Doc. 31-7, at 27-28). This undisputed evidence provided a sufficient basis for MetLife to conclude that the medical treatment provided by Dr. Buffington caused or contributed to the amputation of Rustad-Link's lower right leg, and to deny benefits based on the Plan's illness and medical treatment exclusion.

A.    MetLife's Findings of Fact

Rustad-Link nonetheless argues that MetLife abused its discretion because it misconstrued the medical evidence and premised its application of the illness and medical treatment exclusion on several clearly erroneous findings of fact. In particular, Rustad-Link claims that Dr. Del Valle falsely found in her medical records review report that there was "no reference to perfusions of pressors into the femoral artery," that "[t]he catheter getting pressors was via the femoral vein,"

and that there were no "clinical findings/data to indicate [Rustad-Link] had complications from the insertion of these catheters." (Doc. 31-8, at 29). Rustad-Link claims Dr. Del Valle had no factual basis for concluding that Dr. Buffington properly placed the intravenous line in her right femoral vein because the undisputed medical records show otherwise.

MetLife disputes Rustad-Link's characterization of Dr. Del Valle's report, and maintains she was simply referring to Dr. Buffington's treatment notes at the time of the procedure which indicated he believed it had gone well and was unaware of any problem. (Doc. 31-7, at 12 & 14). But even assuming Dr. Del Valle's factual finding was erroneous, it makes no difference because that finding was not the basis of MetLife's decision. MetLife did not rely on Dr. Del Valle's allegedly erroneous factual finding to conclude that Dr. Buffington did nothing wrong and somehow use that as a basis for denying benefits. To the contrary, MetLife found with record support that while Dr. Buffington was treating Rustad-Link for her lower bowel obstruction, he administered medical treatment that caused or contributed to the subsequent amputation of her lower right leg. (Doc. 31-8, at 35-36).

MetLife's decision is consistent with Rustad-Link's own description of the events leading up to the amputation. As Rustad-Link describes it, "during the

course of treating her for shock," Dr. Buffington "misplaced a central IV line at her right groin in to her femoral artery instead of her femoral vein, which injured the artery and ultimately caused an occlusion."  (Doc. 27, at 5).   According to Rustad-Link, Dr. Buffington "then infused into that line a powerful vaso-constrictor, which, instead of being distributed evenly throughout her body, was concentrated in to the right lower leg, further diminishing the delivery of oxygen and nutrients to her lower leg," at which point "[g]angrene set in and her leg was amputated."  (Doc. 27, at 5).   This version of events is supported by the evidence of record.

 To the extent Rustad-Link suggests that misplacing the intravenous line and infusing pressor medications through the artery was not  "medical treatment" because it was an "accident" on Dr. Buffington's part, she is mistaken.  The fact that Dr. Buffington may have been negligent in administering medical treatment for Rustad-Link's lower bowel obstruction does not somehow remove her claim from the scope of the Plan's medical illness and treatment exclusion.   Negligent or not, Dr. Buffington was providing medical treatment for an illness or infirmity when he placed the intravenous line and infused the medication that caused or contributed to the amputation.   *See e.g.*, *Reid v. Aetna Life Ins. Co.*, 440 F.Supp. 1182, 1183-84 (S.D. Ill. 1977) (pre-ERISA case finding no coverage under a

medical treatment exclusion because patient's death following the accidental injection of lethal drug instead of a normal saline solution was a direct consequence of medical treatment).

Rustad-Link also maintains that MetLife's final denial letter dated August 2, 2012, improperly added several unsubstantiated or irrelevant medical assertions as a basis for denying her claim. (Doc 27, at 17). Specifically, Rustad-Link argues MetLife erroneously found that: (1) right leg weakness and multiple sclerosis medication contributed to the amputation; (2) the occlusion causing loss of blood flow was in the right common iliac artery instead of the femoral artery, and; (3) the femoral intravenous line was never removed. (Doc. 27, at 18).

But even assuming these statements were erroneous, they are not relevant to MetLife's overriding conclusion, which was that medical treatment for an illness or infirmity caused or contributed to the amputation of Rustad-Link's loss. Whether MetLife got every detail right when discussing the nature of that medical treatment or other potentially contributing causes is immaterial. Rather, the question presented is whether MetLife abused its discretion in finding that medical treatment caused or contributed to the loss of Rustad-Link's leg. As discussed above, there is ample evidence supporting MetLife's decision that the amputation resulted from medical treatment of a physical illness or infirmity.

B.    MetLife's Construction of the Plan's Terms

Rustad-Link next argues MetLife abused its discretion because it construed provisions of the Plan in a way that conflicts with the Plan's plain language. Specifically, Rustad-Link maintains MetLife improperly denied her claim based on the illness and treatment exclusion, and ignored an equally applicable exception to a different exclusion.

In addition to the illness and treatment exclusion discussed above, the Plan states that no benefits are available for any loss caused or contributed to by: "the voluntary intake or use by any means of: any drug, medication or sedative, unless it is: taken or used as prescribed by a Physician; or an 'over the counter' drug, medication or sedative taken as directed." (Doc. 31-1, at 77-78).

Rustad-Link argues the prescribed medication exception to the medication intake exclusion applies, and that MetLife should have granted her claim for benefits on that basis. Rustad-Link takes the position that the pressor medication infused through the misplaced intravenous line was medication prescribed by Dr. Buffington, which means that her voluntary use of the medication fits within the prescribed medication exception to the medication intake exclusion.

Rustad-Link contends that MetLife abused its discretion by failing to consider this prescription medication exception, and by relying exclusively on the

medical treatment exclusion to deny coverage. She takes the position that the two exclusions are ambiguous when read together, and argues that MetLife should have construed the ambiguity in her favor as required under Montana law. *See e.g. Fisher ex rel. McCartney v. State Farm Mut. Auto. Ins. Co.*, 305 P.3d 861, 866 (Mont. 2013) (ambiguous provisions in insurance contracts are construed against the insurer and in favor of coverage).

To the extent that Rustad-Link maintains the Plan is ambiguous, the Court agrees. On the one hand, the Plan's medical treatment exclusion can reasonably be read as excluding coverage for loss resulting from the use of prescribed medication, while on the other hand the prescription medication exception to medication intake exclusion can reasonably be read as providing coverage for such a loss. The apparent conflict between these two exclusions gives rise to an ambiguity.

To the extent that Rustad-Link argues that MetLife abused its discretion by not construing this ambiguity in her favor under Montana law, however, she is mistaken. The Court's inquiry on abuse is discretion review is guided by the federal common law of ERISA. *See Canseco v. Construction Laborers Pension Turst for So. Calif.*, 93 F.3d 600, 606 (9th Cir. 1996). Rustad-Link cites *Dupree v. Holman Professional Counseling Centers*, 572 F.3d 1094, 1097 (9th Cir. 2009) for

the proposition that a court reviewing an ERISA policy must apply state rules of

contract interpretation.  But because *Dupree* involved de novo review, it is

distinguishable.

The Ninth Circuit has made clear that where, as here, the court is reviewing

an ERISA administrator's decision denying benefits for an abuse of discretion, the

rule of *contra proferentem*, which requires that ambiguous policy language be

construed in favor of the insured, does not apply. *Blankenship v. Liberty Life*

*Assur. Co. of Boston*, 486 F.3d 620, 625 (9th Cir. 2007).  The appropriate "inquiry

is not into whose interpretation of the plan documents is most persuasive, but

whether the [claim] administrator's interpretation is unreasonable."[1] *Winters v.*

*Costco Wholesale Corp.*, 49 F.3d 550, 553 (9th Cir. 1995).  Under this standard,

MetLife's "interpretation will not be disturbed if reasonable." *Firestone Tire and*

*Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989).

Rustad-Link argues MetLife's interpretation was unreasonable. She claims

that under MetLife's interpretation, the prescription medication exception is

rendered a nullity by the medical treatment exclusion because medication is

---

[1] MetLife notes that although *Winters* involved a self-insured plan, the Ninth Circuit has expanded this rule to apply where, as here, the plan sponsor has funded the plan through an insurance contract and has appointed the insurer as the claim administrator. *See Blankenship*, 486 F.3d at 625; *Maurer v. Reliance Standard Life Ins. Co.*, 2012 WL 6101903 (9th Cir. 2012).

always prescribed to treat an illness or infirmity.  In other words, Rustad-Link

maintains that if all loss caused or contributed to by treatment for illness is

excluded under the medical treatment exclusion, then all loss caused or

contributed to by the use of medication prescribed by a physician to treat that

illness would also be excluded, thereby reading the  prescription medication

exception out of the Plan.  According to Rustad-Link, the only reasonable way to

read the two exclusions together is to conclude that loss resulting from the use of

medication prescribed to treat an illness or infirmity is covered.

To support her position, Rustad-Link relies primarily on  *Clark v.*

*Metropolitan Life Ins. Co.*, 369 F.Supp.2d 770 (E.D Va. 2005).[2]  In *Clark,* an

ERISA plan participant died after accidentally overdosing on a combination of

medications prescribed by his doctor to treat his anxiety, panic disorders, and

acute bronchitis and his beneficiary submitted a claim for accidental death

benefits.  *Clark*, 369 F.Supp.2d at 772.  The ERISA plan at issue in *Clark*

similarly excluded coverage for loss caused by "physical or mental illness or

---

[2] The other out-of-jurisdiction cases Rustad-Link relies on are easily
distinguishable on the ground that they are not ERISA cases and applied state law
rules of contract interpretation pursuant to which the insurer's decision denying
benefits was not entitled to judicial deference and any ambiguities were strictly
construed against the insurer.  *See e.g. Flores v. Monumental Life Ins. Co.*, 620
F.3d 1248, 1255 (10th Cir. 2010); *Edwards v. Monumental Life Ins. Co.*, 812
F.Supp.2d 1263, 1267 (D. Kan. 2011).

diagnosis or treatment for the illness" or "the use of any drug or medicine, unless used on the advice of a licensed medical practitioner."[3] *Clark*, 369 F.Supp.2d at 772.

On review for abuse of discretion, the court agreed that the interpretation proffered by MetLife – which is similar the interpretation it offers here – would render the prescription drug exception to the voluntary drug intake exception a nullity. *Clark*, 369 F.Supp.2d at 778. The court reasoned that "[i]f all deaths caused by treatment for illness were excluded, this would include deaths resulting from the use of medicine on the advice of a licenced medical practitioner where the medicine was prescribed to treat an illness." *Clark*, 369 F.Supp.2d at 778. The court concluded that the exclusions, read in conjunction, "only exclude deaths caused by treatment for illness that do not result from the use of medicine on the advice of a licensed medical practitioner." *Clark*, 369 F.Supp.2d at 778.

While *Clark* describes one reasonable way to read the two exclusions together, this Court cannot say that the alternate interpretation advanced by MetLife is unreasonable. That the Plan can reasonably be read to exclude

---

[3]    Although not expressly stated in the *Clark* opinion, it appears that in denying benefits, MetLife, as the plan administrator, relied on both exclusions. As to the latter exclusion, MetLife concluded the decedent did not use the prescribed medications as advised by his physicians. *Clark*, 369 F.Supp.2d at 780.

coverage is evident from the Illinois appellate court's reasoning in *Brown v. Stonebridge Life Ins. Co. Ins.,* 990 N.E.2d 895 (Ill. App.3d 2013). Although *Brown* was not an ERISA case, the court's reasoning is nonetheless helpful for purposes of determining whether it was reasonable for MetLife to interpret the Plan as precluding coverage. *Brown* addressed similar medical treatment and drug use exclusions under state law standards of insurance policy construction, pursuant to which any ambiguities would haven been construed in favor of the insured. *Brown*, 990 N.E.2d at 900.

As does the Plan at issue here, one of the policies in *Brown* excluded coverage for accidental death benefits for loss resulting from "sickness or its medical or surgical treatment" or from the "taking of any drug, medication, narcotic, or hallucinogen, unless as prescribed by a Physician." *Brown*, 990 N.E.2d at 898. Reading the policy as a whole, the *Brown* court found the only reasonable interpretation of the exclusion for loss resulting from the "taking of any drug, medication, narcotic, or hallucinogen" was "to exclude coverage where an insured's injury resulted from taking illegal drugs or taking controlled drugs other than as prescribed by a doctor." *Brown*, 990 N.E.2d at 900. The court concluded this exclusion was consistent "with the medical treatment exclusion involving an accidental death resulting from the ingestion of narcotics prescribed by a physician

as part of medical treatment for disease or sickness." *Brown*, 990 N.E.2d at 900. As the court explained it, "[w]hen medical treatment involves the use of prescribed narcotics, as in the instant case, the medical treatment exclusion applies on its own accord, without respect to the use of prescribed narcotics, and the drug exclusion for nonprescribed narcotic use is inapplicable." *Brown*, 990 N.E.2d at 901.

The fact that *Brown* and *Clark* reached divergent conclusions simply illustrates that the Plan language at issue is reasonably subject to two different interpretations – one of which is that advanced by MetLife. The medical treatment exclusion can reasonably be read as excluding loss caused or contributed to by medical treatment, including medical treatment that involves the administration of prescribed medication by a physician. Likewise, the medication intake exclusion can reasonably be read as applying to loss resulting from the use of illicit drugs or the improper use of prescribed and over the counter medication by a Plan participant. As discussed above, there is ample evidence supporting MetLife's decision denying Rustad-Link's claim for accidental dismemberment benefits based on the medical treatment exclusion. Having denied coverage on that basis, it was reasonable for MetLife to conclude that the Plan's medication intake exclusion, including its prescribed medication exception, was simply inapplicable. Because MetLife's interpretation reconciles the two exclusions and

is a reasonable one, MetLife did not abuse its discretion and its decision denying

Rustad-Link's claim for benefits should not be disturbed.

## IV.    Conclusion

Based on the foregoing,

IT IS RECOMMENDED that Defendant's motion for summary judgment be

GRANTED and Plaintiff's cross-motion for summary judgment be DENIED.

DATED this 12th day of May, 2014.

_____
Jeremiah C. Lynch
United States Magistrate Judge